**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DENISE ELAYNE JONES and :
MARILYN A. MANZI, individually and :
on behalf of all other similarly situated, :
: Civil Action
Plaintiffs, :
: No. 24-cv-1703
v. :
:
CVS HEALTH CORPORATION, f/k/a CVS :
CAREMARK CORPORATION, :
SILVERSCRIPT INSURANCE COMPANY, :
LLC, CAREMARK L.L.C., f/k/a
CAREMARK INC., CVS PHARMACY,
INC., and CVS CAREMARK PART D
SERVICES, LLC.

Defendants.

<u>**MEMORANDUM**</u>

**J. Younge**                                                          **October 31, 2024**

**I.      INTRODUCTION**

Plaintiffs Denise Elayne Jones and Marilyn A. Manzi ("Plaintiffs") bring this action

individually and on behalf of all other similar situated against Defendants CVS Health

Corporation, f/k/a CVS Caremark Corporation ("CVS Health"), SilverScript Insurance

Company, LLC ("SilverScript"), Caremark L.L.C., f/k/a Caremark Inc., CVS Caremark Part D

Services, LLC (together, "CVS Caremark"), and CVS Pharmacy, Inc. ("CVS Pharmacy")

(collectively herein "Defendants"). The Complaint alleges that Defendants colluded and

conspired with pharmaceutical manufacturers to deny Medicaid Part D beneficiaries access to

less expensive generic alternatives to name-brand drugs, violating the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, *et. seq.,* and various state laws.

(Compl. ¶¶ 15, 93). Currently before this Court is Defendants' Motion to Dismiss pursuant to the

1

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 19.)[1] The Court finds this

Motion appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f). For the

reasons set forth in this Memorandum, Defendants' Motion is GRANTED in PART and

DENIED in PART.

## II.    FACTUAL BACKGROUND

The facts of this case are similar to those discussed by this Court in *United States ex rel.*

*Ellsworth Assoc., LLP v. CVS Health Corp.*, 660 F. Supp. 3d 381 (E.D. Pa. 2023). As in that

case, the Court will begin its discussion by outlining how Medicare Part D operates to provide

context for the scheme alleged by Plaintiffs.

### A.    Medicare Part D

Medicare is the federally funded health insurance program for people who are sixty-five

or older and younger people with certain disabilities or end-stage renal disease. (Defendant's

Brief in Support of Motion to Dismiss, ECF No. 19-1 ("Def.'s Brief"),  p. 2; Compl. ¶ 81). It is

comprised of four parts: Parts A, B, C, and D. (Def.'s Brief, p. 2). Part D, Medicare's optional

prescription-drug coverage, is designed as a public-private partnership. (Def.'s Brief, p. 3). As

such, Medicare enters into contracts with private companies, known as Part D sponsors ("PDPs"

or "Sponsors"), to sponsor Part D plans in which Medicare-eligible individuals can then enroll.

(Def.'s Brief, p. 3; Compl. ¶ 2). SilverScript, which is owned by CVS Health, is one such

Sponsor who contracts with the Centers for Medicare & Medcaid Services ("CMS") (part of the

Department of Health & Human Services). (Compl. ¶ 2; Def.'s Brief, p. 3).

An essential feature of each Part D plan is its formulary, which is a list of drugs covered

by said plan. (Compl. ¶ 83). Pharmacy Benefit Managers ("PBMs"), like CVS Caremark, decide

---

[1] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system,
which does not always match the document's internal pagination.

which drugs a plan will pay for and then negotiate the prices of those drugs with pharmaceutical companies. (Compl. ¶¶ 27, 35). Congress, in its construction of the Act, did not dictate which drugs a plan must include on its formulary. (Def.'s Brief, p. 3) As such, the Act prohibits CMS from requiring a particular formulary, but instead implements a process where would-be plan Sponsors submit their formularies for approval. (Def.'s Brief, p. 3, 6).

As part of a PBM's negotiations of prices to create their formularies, drug manufacturers can offer discounts of their drugs, which PBMs can take a cut of through rebates. (Compl. ¶ 36). In theory, these rebate arrangements would incentivize PBMs to negotiate lower drug prices for Sponsors to pass along to their members. (Compl. ¶ 36). However, as Plaintiffs allege, this process can also be used to create competitive restrictions that increase costs, as drug manufacturers may squelch out competition from cheaper drugs by conditioning the rebates on giving their product preferred status. (Compl. ¶ 139). Plan beneficiaries seeking a drug that is not included in their formulary must either purchase the drug outside of their coverage or request a formulary exception to extend coverage to said drug. (Compl. ¶ 83).

### B. The Alleged Scheme

Plaintiffs allege that Defendants, along with five of the largest manufacturers of name-brand drug products (the Manufacturer Co-Conspirators)[2], implemented a fraudulent scheme to prevent Plaintiffs and other Medicare Part D beneficiaries covered by SilverScript plans from accessing cheaper generic equivalent versions of the prescription drugs Invega, Asacol  HD, Renvela packets, Renvela tablets, Harvoni, Epclusa, Ventolin HFA, Canasa Recta Suppository,

---

[2] The Manufacturer Co-Conspirators are Janssen Pharmaceuticals, Inc., the manufacturer of Invega; Allergan plc (now owned by AbbVie Inc.), the manufacturer of Asacol HD and Canasa Rectal Suppository; Sanofi-Aventis U.S. LLC, the manufacturer of Renvela packets and Renvela tablets; Gilead Sciences, Inc., the manufacturer of Harvoni and Epclusa; and GlaxoSmithKline, the manufacturer of Ventolin HFA and Advair Diskus. (Compl. ¶ 1, n.1)

and Advair Diskus (together, the "Affected Drugs"). (Compl. ¶ 1). In this purported scheme (hereinafter the "No Generic Scheme" or "NG Scheme"), starting around 2015, Defendants allegedly received lucrative rebates from the Manufacturer Co-Conspirators in exchange for obstructing SilverScript beneficiaries' access to generic versions of the Affected Drugs. (Compl. ¶¶ 3, 102). In other words, Plaintiffs' claim that SilverScript's decision to place the Affected Drugs on their formulary was not the product of arms-length negotiations, but rather the terms of an improper collusion between Defendants and the Manufacturer Co-Conspirators. (Compl. ¶ 3).

In furtherance of the NG Scheme, Defendants allegedly manipulated CVS Pharmacies to block their customers from filling their prescriptions with generic drugs, ultimately ensuring that SilverScript plan beneficiaries could only fill their prescriptions with name-brand versions of the Affected Drugs included in the formulary. (Compl. ¶¶ 104-105). According to a confidential witness employed as a Staff Pharmacist in a CVS Pharmacy ("CW1"), CVS Pharmacy's drug dispensation system, which routes all prescription requests electronically to CVS Caremark for determination and approval, would restrict pharmacist from dispensing the generic version of certain Affected Drugs. (Compl. ¶ 104). Further, CVS Pharmacies would often have inadequate stock of certain generic drugs, while simultaneously maintaining an unusual overstock of the name-brand drug. (Compl. ¶ 105). As a result, even if the system allowed a pharmacist to dispense a generic drug, they might not be able to fill the prescription with the generic due to inventory shortages. (Compl. ¶ 105). According to another confidential witness employed as Pharmacy Benefits Manager at CVS Health between 2020 and 2023 ("CW2"), who made similar claims as CW1, these practices "felt like CVS was forcing people to take the more expensive medications," making SilverScript beneficiaries "pretty much hit a dead end." (Compl. ¶ 119).

CW1 and other staff pharmacists spoke with CVS Health District Manager, Simon Mittelholzer, to question why the system would not authorize generics for certain brand name drugs. (Compl. ¶ 107). In response, Mittelholzer allegedly explained that Defendants had deals with the Manufacturer Co-Conspirators to dispense the name-brand versions of the Affected Drugs over the generic equivalents. (Compl. ¶ 107). Some of these agreements with Defendants required SilverScript to deny formulary exceptions for the less costly generic and CVS Pharmacy to stop stocking said generic drug.[3] (Compl. ¶¶ 108-110). Plaintiffs allege officials within the Defendants' management expressed their discomfort with these agreements, including CVS Health Vice of President of Medicare Operations, Emily Pefanis. (Compl. ¶ 109).

In addition to alleged actions taken by CVS Pharmacy, Plaintiffs claim that SilverScript representatives who responded to beneficiary phone calls misled beneficiaries about the availability of less expensive generic alternatives to the drug they had been prescribed. (Compl. ¶¶ 111-112). Specifically, they allege that when these representatives received calls from beneficiaries inquiring about their prescription drugs, the representative read from SilverScript-created scripts to mislead the beneficiaries. (Compl. ¶ 111). From these scripts, representatives allegedly would: (1) omit the price differential between cost of the generic and the name-brand; (2) claim that there were few manufactures marketing generic versions of the generic drugs, even tough multiple generics were available; (3) state that using name-brand medications on the formulary would keep beneficiaries cost low, while claiming that the costs of generics are likely

___

[3] Plaintiffs allege that SilverScript's policy of "issuing blanket denials of formulary exceptions for the Affected Drugs" did not begin until 2018. (Compl. ¶ 118). Prior to that, from the time the NG Scheme was implemented until 2018, SilverScript beneficiaries who requested formulary exceptions through the coverage determination process were largely approved. (Compl. ¶ 118). While SilverScript did not block beneficiaries that sought to go through this long process during this period, it allegedly hid information about the availability of generic drugs to dissuade beneficiaries away from attempting the process. (Compl. ¶¶ 117-118).

similar; (4) attribute SilverScript's lack of coverage for generic versions of the Affected Drugs to "market conditions," while omitting the alleged NG scheme; and (5) steer beneficiaries away from requesting a formulary exception by omitting information about cost of generics. (Compl. ¶¶ 113-117).

All of this alleged behavior, according to Plaintiffs, was at the expense of SilverScript beneficiaries and to the benefit of Defendants' pockets. (Compl. ¶ 120). If the NG Scheme occurred as Plaintiff alleges, then it effectively forced SilverScript beneficiaries, or anyone who was filling their prescription at CVS Pharmacies, to pay for the more expensive name-brand version of the Affected Drug to obtain their medication. (Compl. ¶ 106). In February of 2019, for example, the price difference between the name-brand Affected Drugs and the generic equivalents at CVS ranged from 233% to 467%. (Compl. ¶ 121).

### C.   The Named Plaintiffs

Plaintiffs Denise Elayne Jones and Marilyn A. Manzi bring this action individually and on behalf of all other similarly situated. The Complaint seeks to recover damages under RICO, 18 U.S.C. §§ 1962, *et. seq.* (Counts I and II), and state law fraud (Count III), negligence per se, or, alternatively, negligence (Count IV), unjust enrichment (Count V), and state consumer protection acts (Count VI).[4]

### i.   *Denise Elayne Jones*

Plaintiff Denise Elayne Jones, a SilverScript beneficiary who resides in Maryland, asserts that she has regularly filled her prescription for Advair Diskus at CVS Pharmacies in Maryland since she was first prescribed said drug in 2016. (Compl. ¶ 23). On several of these occasions, Jones claims that she asked to purchase the generic form of Advair Diskus, but Defendants

---

[4] Plaintiffs are no longer pursuing claims for negligence per se, or in the alternative, negligence. (Plaintiff's Response Brief, ECF No. 27 ("Plf.'s Response"), p. 4).

repeatedly told her that it was not available for SilverScript beneficiaries nor offered by CVS Pharmacy.[5] (Compl. ¶ 23). As a result, from at least 2016 to 2024, Jones paid a $20.00 copay for a 30-day supply of Advair Diskus and $40.00 for a 90-day supply. (Compl. ¶ 23). Jones alleges that if the generic form of Avair Diskus was included in her SilverScript formulary, and dispensed by CVS Pharmacy, she only would have paid $5.00 for a 30-day supply of said drug. (Compl. ¶ 23).

ii.    *Marilyn A. Manzi*

Plaintiff Marilyn A. Manzi, a Florida resident who has been a SilverScript beneficiary for approximately ten years, asserts that she has regularly filled prescriptions at CVS Pharmacies in Florida since 2018, including her prescription for Renvela tablets. (Compl. ¶ 24). On these occasions, Manzi claims that CVS Pharmacy never offered the generic version of Renvela tablets, but instead filled her prescription with the name-brand version of Renvela tablets. (Compl. ¶ 24). As a result, she would pay a $47.00 copay for a 180-cout bottle for name-brand Renvela tablets. (Compl. ¶ 24). Manzi alleges that if the generic form of Renvela tablets were included in her SilverScript formulary, and dispensed by CVS Pharmacy, she would have paid less. (Compl. ¶ 24).

## III.    LEGAL STANDARD

### A.    Rule 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) challenges the existence of a federal court's subject matter jurisdiction.[6]  When subject matter jurisdiction is challenged under Rule

---

[5] The Complaint alleges that on one occasion Jones was told this information during a telephone conversation with a CVS Caremark representative in the summer of 2023. (Compl. ¶ 23).

[6] Federal Rule of Civil Procedure 12(h)(3) states, "if the court determines at any time that it lacks subject matter jurisdiction, the Court must dismiss the action."  A federal district court is a court of limited jurisdiction and has an independent obligation to inquire into whether it has subject

12(b)(1), the plaintiff must bear the burden of persuasion. *Kehr Package, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *Schneller ex rel. Schneller v. Crozer Chester Med. Ctr.*, 387 F. App'x 289, 292 (3d Cir. 2010) (citing *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993)). In reviewing a motion brought pursuant to rule 12(b)(1), the Court should determine whether the motion presents a facial or factual challenge. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). A motion to dismiss for lack of subject matter jurisdiction may either "attack the complaint on its face . . . [or] attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction*." Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists. *Mortensen*, 549 F.2d at 891; *see also Cardio-Med. Assocs. Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983). A factual attack under Rule 12(b)(1) challenges the very power of a district court to hear a case, independent of the pleadings. *Mortensen*, 549 F.2d at 891.

When evaluating a factual challenge, a court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. Unlike a facial attack, no

matter jurisdiction to preside over a case. See Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 77 (3d Cir. 2003). Federal courts have an ever-present obligation to ensure that subject matter jurisdiction exists, and they can raise issues of subject matter jurisdiction sua sponte at any time. Fed. R. Civ. P. 12(h)(3); Liberty Mut. Ins. Co. v. Ward Trucking Corp., 48 F.3d 742, 750 (3d Cir. 1995) ("Federal courts have an ever-present obligation to satisfy themselves of their subject matter jurisdiction and to decide the issue sua sponte."); Johnson v. United States, No. 08-0816, 2009 U.S. Dist. LEXIS 76545, at *6 (M.D. Pa. Aug. 27, 2009). A district court should dismiss a complaint if it lacks subject matter jurisdiction over the claims because without subject matter jurisdiction the court does not have the power to hear the case. Fed. R. Civ. P. 12(b)(1); Mortensen v. First Fed. Sav and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

presumption of truth attaches to the plaintiff's allegations in a factual challenge and "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. Furthermore, in a factual challenge, the plaintiff bears the burden of establishing that jurisdiction exists. Id. The district court is not required to convert a motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment merely because the court considers evidence outside the complaint. *Medica v. City of Philadelphia*, 219 F. App'x 169, 172 (3d Cir 2007).

Here, Defendants launched a factual attack by supplementing the factual allegations in the Plaintiff's Complaint with extrinsic evidence. *See DeMolick v. United States*, No. 33-1973, 2023 WL 3562979 at *2, (3d. Cir. May 19, 2023) (approving district court construing Rule 12(b)(1) motion as factual attack because it introduced new facts).

### B.    Rule 12(b)(6)

The standard for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is examined in detail in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). After *Iqbal*, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim [for] relief that is plausible on its face.'" *Tatis v. Allied Interstate*, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). All well-

pleaded allegations in the complaint must be accepted as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in the plaintiffs' favor. *See McTernan v. City of York*, 577 F. 3d 521, 526 (3d. Cir. 2009). Thus, this Court must examine Plaintiff's claims to determine whether it can infer that Defendant is liable for the alleged misconduct.

## IV.    DISCUSSION

### A.    This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims

Defendants make three arguments to support their assertion that this Court lacks subject matter jurisdiction to review Plaintiffs' claims: (1) Plaintiffs' claims are covered by the Medicare Act, requiring exhaustion of administrative remedies, which Plaintiff has failed to exhaust; (2) Plaintiffs' state law claims are expressly preempted by the Medicare Act; and (3) Plaintiffs lack standing to pursue their non-Maryland or Florida claims. (Def.'s Brief, p. 16-26). Despite the attempt, this Court is not persuaded by the Defendants attack on this Court's jurisdiction.

#### i.    *Exhaustion of Administrative Remedies*

As mentioned, "Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 et seq., commonly known as the Medicare Act, establishes a federally subsidized health insurance program to be administered by the Secretary [of Health and Human Services ('Secretary').]" *Heckler v. Ringer*, 466 U.S. 602, 605 (1984). This Court's review of a claim that arises under the Medicare Act is only available after the Secretary renders a final decision on a litigant's claim, such that the litigant has exhausted their administrative remedies required under the Act. *See* 42 U.S.C. § 405(g), (h); *see also Heckler*, 466 U.S. at 605. Claims arise under the Medicare Act if (1) "both the standing and the substantive basis for the presentation of the claim is the Act" or (2) "the claim is inextricably intertwined with the Act." *Trostle v. Centers for*

*Medicare & Medicaid Servs.*, 709 F. App'x 736, 739 (3d Cir. 2017) (citing *Heckler*, 466 U.S. at 614-15) (internal quotations omitted). Courts have "broadly" interpreted the type of claims that arise under the Act. *Id.*

First, Defendants argue that Plaintiffs' claims arise under the Act because they are "rooted in… [Plaintiffs'] asserted rights as Part D Beneficiaries." (Def.'s Brief, p. 18). From Defendants' perspective, the substantive basis for Plaintiffs' claims turn on whether SilverScript had a duty to include generic versions of certain brands in their formulary, such that Plaintiffs' allegations that Defendant misled beneficiaries about the availability of generic drugs "raise[s] challenges grounded in duties imposed by the Act." (Def.'s Brief, p. 18).

This Court finds Defendants' characterization of Plaintiffs' claims unconvincing. The alleged NG Scheme in the Complaint details a collusion between Defendants and the Manufacturer Co-Conspirators "to deny SilverScript beneficiaries' access to less expensive generic alternatives to brand name drugs… in order for… Defendants to collect substantial rebates from the Manufacturer Co-Conspirators." (Compl. ¶ 94). Plaintiffs assert that Defendants took various actions to deny beneficiaries access to these generics, including excluding them from their formulary, preventing pharmacists from filling prescriptions with generics, maintaining inadequate stock of certain generics, denying formulary exception requests, misleading consumers about the availability of generics, and employing other tactics that forced beneficiaries to pay more for costly name-brand drugs. (Compl. ¶ 94-139). While the formulary is a key element of the alleged NG Scheme, it is just one of many actions underpinning the fraud outlined in the Complaint. Thus, while the formulary and Medicare Part D context are relevant, the outcome of the claims hinge on the substantive elements of the alleged fraud.

The contrast between the claims here and those alleged in *Temple Univ. Hosp., Inc. v. Sec'y United States Dep't of Health & Hum. Servs.* illuminates this point. 2 F.4th 121 (3d Cir. 2021). In that case, a Philadelphia hospital was reclassified within the New York City area, which would have increased its Medicare reimbursement rate. *Id.* at 124. However, contrary to the statutory three-year period intended for the reclassification, the hospital was reassigned to the New Jersey area. *Id.* This change led to a lawsuit against the Secretary. *Id.* The Third Circuit held that these claims arose under the Medicare Act because the substantive basis of the claim was the three-year reclassification period in the statute, which made the merits of the claim depend on whether that statute was violated. *See id.* at 131. Here, there is no statutory provision that the Plaintiffs are invoking for their claim. In fact, as Plaintiffs note, the Act does not allow CMS to require specific inclusions in a formulary, leaving Plaintiffs with no statutory ground to challenge the exclusion of generics from a formulary in administrative review. Instead, and unlike *Temple*, the substantive basis to challenge Defendants' actions are Plaintiffs' fraud-based federal and state claims.

Finally, Defendants contend that Plaintiffs' claims arise under the Act because they are "inextricably intertwined with a claim for benefits under their Part D plans." (Def.'s Brief, p. 18). They argue that the Complaint's challenge to SilverScript's decision not to include generic versions of the Affected Drugs in the formulary constitutes a claim for benefits under the Act. (Def.'s Brief, p. 18). However, as previously mentioned, the Complaint details a series of actions that denied Plaintiffs access to generic versions of the Affected Drugs, effectively forcing them to purchase the name-brand versions. The misrepresentations and omissions related to the NG Scheme are the foundation of the federal and state claims, not the Act; thus, Plaintiffs seeks to remedy the fraud itself, rather than merely contesting the denial of specific benefits. *See Heckler*,

466 U.S. at 618 (noting that where a claim is "wholly 'collateral' " to a claim for benefits, it is not subject to § 405(h)). As such, Plaintiffs' claims do not conflict with the purpose of the exhaustion requirement—"to give the administrative process the first opportunity to resolve disputes over eligibility or the amount of benefits awarded under the Act." *United States v. Blue Cross & Blue Shield of Alabama, Inc.*, 156 F.3d 1098, 1103 (11th Cir. 1998).

### ii. *Preemption*

Defendants further argue that even if Plaintiffs had exhausted the administrative remedies under the Medicare Act—assuming, *arguendo*, that their claims arose under the Act—that the state law claims would be expressly preempted by a provision of the Part D section of the Act. (Def.'s Brief, p. 20). This Court declines to decide on this issue because Plaintiffs' state claims do not arise under the Act for the reasons set forth above; therefore, the preemption questions raised by the Defendants are moot.

### iii. *Standing*

Article III of the Constitution requires Plaintiffs to have standing in order to assert their claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing requires Plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). Plaintiffs "must demonstrate standing for each claim they seek to press and for each form of relief sought," as "standing is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up).

In the context of a class action, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."

*Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotations omitted). Defendants argue that the Plaintiffs Jones and Manzi only have standing for states where they reside, Maryland and Florida respectively, and can not establish standing for their numerous claims under other states. (Def.'s Brief, Section III).  However, "[c]ourts have taken different views about how to evaluate Article III and class standing at the motion to dismiss stage where putative class representatives assert claims arising under the laws of states where they neither reside nor allege to have suffered injury." *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 829 (E.D. Pa. 2019). While "[t]he Third Circuit has not definitively answered this question," *id*, in *Neale v. Volvo Cars of N. Am., LLC*, the Court held that absent class members need not establish standing prior to the class certification stage. *See* 794 F.3d 353, 362 (3d Cir. 2015).

Courts in this District have come to competing conclusions on how *Neale* should be applied to answer this standing question. Judge DuBois' decision in *In re: Niaspan Antitrust Litigation* concluded that *Neale* "did not relieve plaintiffs of their burden of establishing that at least one *named plaintiff* has Article III standing to pursue each claim plaintiffs assert," such that "named plaintiffs… lack standing to bring claims on behalf of putative classes under the laws of states where no named plaintiff is located and where no named plaintiff [suffered an injury]." No. 13-MD-2460, 2015 WL 8150588, at \*3 (E.D. Pa. Dec. 8, 2015). On the other hand, in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Judge Rufe's analysis of *Neale* and other cases led the Court to conclude the following:

> Because the state law claims of the named [parties] largely parallel those of the putative class members, it is both proper and more efficient to consider whether they may pursue their claims on behalf of the unnamed class members in the context of the class certification analysis required under Rule 23 of the Federal Rules of Civil Procedure

(*e.g.*, commonality and typicality under 23(a), and predominance under 23(b) ).

Therefore, [the parties'] claims on behalf of absent class members will not be dismissed

for lack of Article III standing.

368 F. Supp. 3d 814, 831 (E.D. Pa. 2019). Other courts in this District have also rejected

*Niaspan's* interpretation of *Neale*, finding that once the named plaintiffs have standing, whether

they can represent absent class members from other states is reserved for class certification, not a

motion to dismiss. *See e.g., Suber v. Liberty Mut. Ins. Grp.*, 650 F. Supp. 3d 282, 294 (E.D. Pa.

2022) ("Plaintiffs have no burden at the outset to establish standing for unnamed class members

from all fifty states in order to sustain a nationwide class, hence *Neale*'s holding that Article III

standing does not need to be established for absent class members…"); *Mayor & City Council of*

*Baltimore v. Merck Sharp & Dohme Corp.*, No. CV 23-828, 2023 WL 8018980, at *10 (E.D. Pa.

Nov. 20, 2023) ("It is an obvious truth that class actions necessarily involve plaintiffs litigating

injuries that they themselves would not have standing to litigate.")(internal quotations omitted).

Further, Circuits that have squarely considered this issue have reached the same

conclusion. *See Langan v. Johnson & Johnson Consumer Companies, Inc*., 897 F.3d 88, 96 (2d

Cir. 2018) ("[W]hether a plaintiff can bring a class action under the state laws of multiple states

is a question of predominance under Rule 23(b)(3), not a question of standing under Article

III."); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 50–51 (1st Cir. 2018) ("Finding Article III

standing otherwise satisfied in this case is… in line with our prior precedent, in which we

required only that a plaintiff make a single purchase in order to satisfy standing for a claim

brought under multiple state laws.").

Considering this case law, this Court agrees with Judge Rufe's view—once the named

plaintiffs have Article III standing, representation of absent class members under similar state

laws is an issue left for class certification. Defendants have not contested the named Plaintiffs'

standing, so this Court will not disrupt their ability to pursue their non-Maryland or Florida

claims at this stage in the litigation. If Defendants wish to contest Plaintiffs' ability to represent

absent class members, then "[t]he class certification motion will provide Defendants ample

opportunity to contest the adequacy of named Plaintiffs to represent the class, the typicality of

their claims, and the predominance of common questions of law or fact, with the burden of

persuasion on the Plaintiff to make such showings." *Suber*, 650 F. Supp. 3d at 294. For now,

Defendants arguments under 12(b)(1) are denied.

### B.      Plaintiffs Have Sufficiently Pled Counts I, II, III, and VI

#### i.      *Rico and Conspiracy to Violate Rico* (Counts I and II)

Plaintiffs allege that Defendants, through the NG scheme, violated Section 1962(c) of

RICO, which makes it unlawful for "unlawful for any person employed by or associated with

any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity." 18 U.S.C. § 1962(c). Plaintiffs also allege that the scheme

violated Section 1972(d), which prohibits "any person to conspire to violate" § 1962(c). 18

U.S.C. § 1962(d).

To sufficiently plead a § 1962(c) RICO claim, Plaintiffs "must allege (1) conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity." *In re Ins. Brokerage Antitrust

Litig.*, 618 F.3d 300, 362 (3d Cir. 2010). Additionally, liability under § 1962(d) for a RICO

Conspiracy to violate § 1962(c) requires Plaintiff to plead "1) knowledge of the corrupt

enterprise's activities and 2) agreement to facilitate those activities." *Smith v. Berg*, 247 F.3d 532,

535 (3d Cir. 2001). However, "a § 1962(d) claim must be dismissed if the complaint does not

adequately allege an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 373. (cleaned up).

Defendants' arguments contest whether Plaintiffs have satisfied the racketeering element of their claim. (Def.'s Brief, p. 26). The term 'racketeering activity" is defined to include several acts, including "any act which is indictable under... section 1341 (relating to mail fraud) [and] section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). In the Third Circuit, "the elements necessary to establish [a violation of 18 U.S.C. § 1341] are (1) a scheme or artifice to defraud for the purpose of obtaining money or property and (2) use of the mails in furtherance of the scheme." *United States v. Yusuf*, 536 F.3d 178, 187 (3d Cir. 2008). The federal wire fraud statute is nearly identical to the federal mail fraud statute. *See United States v. Morelli, 169 F.3d 798, 806* (stating that "[w]ire fraud consists of (1) a scheme to defraud and (2) a use of a wire transmission for the purpose of executing, or attempting to execute, the scheme"). Further, the Third Circuit cautions that "[a]llegations of mail or wire fraud as the bases for a RICO violation must be pled with specificity." *Carmona v. New Jersey Dep't of Educ.*, No. 22-2874, 2023 WL 5814677, at *7 (3d Cir. Sept. 8, 2023), *cert. denied*, 144 S. Ct. 1059 (2024) (internal quotations omitted).

Defendants deploy several arguments to demonstrate that Plaintiffs have not sufficiently pled the racketeering element of their RICO claim. First, Defendants argue that the alleged "scheme to 'restrict access'—absent a false statement—does not plausibly allege a violation of the federal mail and wire fraud statutes." (Def.'s Brief, p. 27). To the contrary, the Supreme Court has clearly articulated that "[t]he gravamen of the offense is the scheme to defraud, and any mailing… incident to an essential part of the scheme… satisfies the mailing element… even if the mailing contains no false information." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S.

17

639 (2008) (internal quotations and citations omitted). The Third Circuit put its plainly: "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) (internal quotations omitted). The fact that Plaintiffs allege that Defendants committed acts of "concealment and omissions," instead of alleging "affirmative false statements," (Plaintiff's Response Brief, ECF No. 27 ("Plf.'s Response"), p. 3), does not conclusively make their pleading of racketeering activity insufficient.

Second, Defendants argue that Plaintiffs failed to "identify" their allegations of misleading statements and misrepresentations "with the specificity required by Rule 9(b)." (Def.'s Brief, p. 27). As mentioned, allegations of mail, wire or other fraud by Defendants are "required to adhere to the higher pleading standard of 'particularity' mandated by Fed.R.Civ.P. 9(b)." *Rose v. Bartle*, 871 F.2d 331, 356 n.33 (3d Cir. 1989). However, in situations where "sophisticated defrauders may successfully conceal the details of their fraud[,]" such that it "can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (internal quotations omitted). In this relaxed standard, Plaintiffs still must present "factual allegations that make their theoretically viable claim plausible," including the "who, what, when, where and how of the events at issue." Id. at 216-17 (internal quotations omitted).

As detailed above, Plaintiffs pled sufficient facts about the alleged NG Scheme to satisfy the relaxed 9(b) standard. The Complaint outlines the parties involved—Defendants and the Manufacturer Co-Conspirators. Further, the Complaint provides statements from two

confidential witnesses who work for Defendants and identifies other executives that have made

statements about the scheme. Plaintiffs allege numerous actions taken by Defendants to defraud

beneficiaries by blocking their access to generic drugs, including alleged statements made to

mislead beneficiaries about the availability of generic drugs. The Complaint also alleges that the

NG Scheme, beginning in 2015 and continuing through the present, was established for

Defendants and Manufacturer Co-Conspirators financial benefit. As such, the pleading standard

for Rule 9(b) is satisfied.

       Finally, Defendants claim that "when alleging fraud based on an omission or failure to

disclose material information, a plaintiff must allege a valid duty to disclose that information."

(Def.'s Brief, p. 29). According to Defendants, Plaintiffs' failure to allege that Defendants had

such a duty is fatal to their fraud-based claims. (Def.'s Brief, p. 29). If this were a case where

Plaintiffs were alleging that Defendants' mere silence was fraudulent, then a duty to disclose

might be required. *See Chiarella v. United States*, 445 U.S. 222, 232 (1980). However, in this

situation, where the alleged scheme can more aptly be considered "active concealment," a "duty

to disclose is not always a required element… when there has been a material nondisclosure."

*Sonneberg v. United States,* No. 01–2067, 2003 WL 1798982 (3d Cir. Apr. 4, 2003). Here, the

Complaint highlights numerous acts allegedly taken by Defendants to mislead beneficiaries

about the availability of generic drugs and failing to disclose details about the NG Scheme.

Allegations of fraudulent "conduct involving affirmative concealment, such as deceptive acts or

contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry

into a material matter is, like an affirmative misrepresentation, sufficient to establish fraud."

*United States v. Naselsky*, 561 F. App'x 155, 160 (3d Cir. 2014) (internal quotations omitted).[7]

### ii.    *Fraud (Count III)*

Mirroring their challenge to Plaintiffs' RICO claim, Defendants argue that Plaintiffs'

omission theory of fraud hinges on identifying a duty to disclose information to adequately plead

their state fraud claims. (Def.'s Brief, p. 35-36). Defendants limit this challenge to Plaintiff's

fraud claims under Maryland and Florida law, so this Court will only analyze whether a duty to

disclose is required in those states. (Def.'s Brief, p. 36). And as previously explained, Plaintiffs'

theory of fraud more accurately qualifies as active concealment, so the analysis will determine

whether this theory is sufficiently pled.

Unlike federal law, as Defendants note, Maryland and Florida state law require there be a

duty to disclose to sufficiently plead fraudulent concealment. *See R.J. Reynolds Tobacco Co. v.*

*Martin*, 53 So. 3d 1060, 1068 (Fla. Dist. Ct. App. 2010) ("To prevail on the fraud by

concealment claim, the plaintiffs had to prove… the tobacco companies had a duty to disclose

the material fact…"); *Green v. H & R Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039, 1059

(1999) ("Both parties agree on the essential elements of a claim for fraudulent concealment.

They include: (1) the defendant owed a duty to the plaintiff to disclose a material fact…").

Plaintiffs argue that they have sufficiently pled facts for a common law duty to arise. (Pl.'s

Response, p. 35). Under Maryland law, "[e]ven in the absence of a duty of disclosure, one who

suppresses or conceals facts which materially qualify representations made to another may be

guilty of fraud." *Sass v. Andrew*, 152 Md. App. 406, 430, 832 A.2d 247, 260 (2003) (citing *Finch*

*v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867, 891 (1984)); *Est. of White ex rel.*

---

[7] Because no duty is required, this Court declines to review Defendants' argument regarding whether the Medicare Act imposes a duty to disclose.

*White v. R.J. Reynolds Tobacco Co*., 109 F. Supp. 2d 424, 431 (D. Md. 2000) ("A duty to speak arises… at times when one party makes a partial and fragmentary statement of fact.") (internal citations and quotations omitted). Generally, under Florida law, there is "no duty to disclose facts that the other party could have discovered through its own diligence," but there are exceptions to this rule: (1) if a party "has a fiduciary relationship with the other party, then the fiduciary has a duty to disclose all material facts;" (2) if a party "undertakes to disclose some information, all material facts must be disclosed;" and (3) "nondisclosure of a material fact may be actionable where one does not have an equal opportunity to become apprised of the material facts." *In re Palm Ave. Partners, LLC*, 576 B.R. 239, 247-51 (Bankr. M.D. Fla. 2017) (analyzing the duty element of a "fraudulent omission or concealment claim.").

        Here, under both the Florida and Maryland standards, Plaintiffs have pled sufficient facts to establish a common law duty to disclose. The Complaint asserts that, within the NG Scheme, Defendant representatives misled beneficiaries about the availability and cost of generic alternatives to the Affected Drugs, effectively compelling them to fill their prescriptions with the name-brand versions. Further, Plaintiffs claim that the SilverScript formulary states that there would be occasional substitutions for lower-cost generic drugs. However, the Defendants concealed information about the NG Scheme. This information is clearly material, as it would affect Plaintiffs' decision to pay out-of-pocket costs associated with prescriptions of the Affected Drugs. In theory, if equipped with this information, a beneficiary might have decided to pursue insurance under a different plan or seek out out-of-pocket drugs from a pharmacy that is not owned by Defendants. At any rate, because the Complaint pleads that Defendants shared some and concealed other material from Plaintiff Jones of Maryland and Plaintiff Manzi of Florida, Plaintiffs have sufficiently plead facts to establish a duty to disclose for their fraud claim.

### iii.    *Unjust Enrichment (Count V)*

Instead of contesting whether Plaintiffs pled sufficient facts to support an unjust

enrichment claim, Defendants argue that "Plaintiffs fail[ed] to allege under which state's law

they are bringing their unjust enrichment claim," which Defendants assert warrants dismissal of

said claim. (Def.'s Brief, p. 39). "Courts in this District have dismissed unjust enrichment claims

brought on behalf of multi-state classes when plaintiffs do not identify which states' laws apply."

*Pierre v. Healthy Beverage, LLC*, No. CV 20-4934, 2022 WL 596097, at *14 (E.D. Pa. Feb. 28,

2022); *see also U.S. ex rel. Krahling v. Merck & Co., Inc.*, 44 F. Supp. 3d 581 (E.D. Pa. 2014)

(finding the same). In response, Plaintiffs assert that their reference to a "Nationwide Class or,

alternatively, the Maryland and Florida Sub-Classes" does identify the state laws. (Pl.'s

Response, p. 40). However, unlike *In re Suboxone (Buprenorphine Hydrochloride & Naloxone)

Antitrust Litig.,* where the complaint "invoked the laws of all fifty states (except Ohio and

Indiana) and the District of Columbia," Plaintiffs' mere mention of the Nationwide Class falls

shorts of adequately identifying the state laws under which Plaintiffs assert their claims. 64 F.

Supp. 3d 665, 703 (E.D. Pa. 2014).[8] Because of this deficiency, "the claim cannot go forward as

is, and the Court will allow amendment so Plaintiffs can identify applicable state law." *Pierre*,

2022 WL 596097, at *14.

### iv.    *State Consumer Protection Acts (Count VI)*

Defendants argue that Plaintiffs have not sufficiently pled their consumer protection act

claims because (1) some state consumer protection laws require a duty, which they claim is

absent here; (2) Plaintiffs failed to specify how each state's law was violated; and (3) several

state laws do not permit class actions.

---

[8] The Complaint in that case says "Fifty States & District of Columbia, Except Ohio and
Indiana." Consolidated Am. Class Action Compl., 13-md-2445, p. 62, ECF No. 48.

First, Defendants' assertion that Plaintiffs' claim fails for lack of valid duty challenges to the consumer protection laws in Arizona, California, Connecticut, Delaware, Hawaii, Idaho, Kansas, Louisiana, Maryland, Michigan, Minnesota, Missouri, New Mexico, Nevada, Oklahoma, Texas, and Washington.[9] (Def.'s Brief, p. 36-38). However, to the contrary, Hawaii, Michigan, Missouri, Nevada, Oklahoma and Florida statutes do not require any independent duty to disclose. *See Cohen v. Subaru of Am., Inc.*, No. 120CV08442JHRAMD, 2022 WL 714795, at *25 (D.N.J. Mar. 10, 2022) ("the Court's research did not identify authority stating that a duty to disclose must exist for omission-based [Hawaii Deceptive Trade Practices Act] claims."); *Speerly v. Gen. Motors, LLC*, 343 F.R.D. 493, 543 (E.D. Mich. 2023), *aff'd,* 115 F.4th 680 (6th Cir. 2024) ("A[ Michigan Consumer Protection Act] claim premised on a failure to disclose material facts does not require a consumer to prove reliance or a duty to disclose."); *Riddell v. Gen. Motors LLC*, No. 1:20-CV-254-SNLJ, 2024 WL 2077559, at *7 (E.D. Mo. May 9, 2024) ("[no] cases support that such a common law 'duty to disclose' is required under the [Missouri Merchandising Practices Act]"); *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1199 (D. Nev. 2022) ("Defendant MGM has not shown that fraud by omission under NRS § 598.0923(1)(b) requires an affirmative duty to disclose."); *Est. of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 409 (E.D. Mich. 2023) (Not including a duty to disclose as an element under the Oklahoma Consumer Protection Act);*Morris v. ADT Sec. Servs.,* 580 F. Supp. 2d 1305, 1310 (S.D. Fla. 2008) ("[A] duty to disclose is not an element of [the Florida Deceptive and Unfair Trade Practices Act].").

The Arizona, California, Connecticut, Delaware, Kansas, Louisiana, Minnesota, New Mexico, Texas, and Washington statutes, on the other hand, recognize that a duty to disclose

---

[9] The Complaint lists the consumer protection acts that Plaintiffs are suing under. (Compl. ¶ 330).

arises where a defendant conceals a material fact; like what's recognized under the Maryland and Florida common law. *See Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 577 (N.D. Cal. 2019) (Applying the Arizona Consumer Fraud Act, "Arizona law imposes a duty to disclose when a defendant actively conceals a material defect."); *Shay v. Apple Inc.*, 512 F. Supp. 3d 1066, 1074 (S.D. Cal. 2021) ("[C]ourts have also held that a duty to disclose under the [California Consumer Legal Remedies Act] and [California Unfair Competition Law] can arise… when the defendant had exclusive knowledge of material facts not known to the plaintiff."); *Miller v. Guimaraes*, 78 Conn. App. 760, 776, 829 A.2d 422, 435 (2003) (Under the Connecticut Unfair Trade Practices Act, "[a] party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak."); *Murphy v. Berlin Const. Co.*, No. 98C-01-097 WTQ, 1999 WL 41633, at *3 (Del. Super. Ct. Jan. 22, 1999) ("A duty to speak can be created by… a partial disclosure of facts that require the disclosure of additional facts to prevent a misleading impression."); *Delaware Valley Fish Co. v. 3South LLC*, 601 F. Supp. 3d 7, 20 (M.D. La. 2022) (Under the Delaware Consumer Fraud Act, if "a party volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth.") (internal quotation omitted); *Marksberry v. FCA US LLC*, 606 F. Supp. 3d 1075, 1083 (D. Kan. 2022) ("Under the [Kansas Consumer Protection Act], a supplier has a duty to disclose only if it knows that the consumer is entering into a transaction under a mistake about the material fact.") (internal quotations omitted); *Delaware Valley Fish Co. v. 3South LLC*, 601 F. Supp. 3d 7, 26 (M.D. La. 2022) (Under the Louisiana Unfair Trade Practices and Consumer Protection Law, "a partial disclosure of information gives rise to the duty to provide correct information… a duty to provide the plaintiffs with the whole truth.") (internal quotations omitted); *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850

N.W.2d 682, 695 (Minn. 2014) ("[S]pecial circumstances may trigger a duty to disclose material facts… a person who speaks must say enough to prevent the words communicated from misleading the other party.") *Schwartz v. State Farm Mut. Auto. Ins. Co.*, No. 1:18-CV-00328-WJ-SCY, 2018 WL 4148434, at *6 (D.N.M. Aug. 30, 2018) ("The [New Mexico Unfair Practices Act] ... imposes a duty to disclose material facts reasonably necessary to prevent any statements from being misleading."); *Washburn v. Sterling McCall Ford*, 521 S.W.3d 871, 876 (Tex. App. 2017) ("A [Texas Deceptive Trade Practices Act] violation for failure to disclose requires the defendant to have known material information and have failed to bring it to the plaintiff's attention.*"); Polygon Nw. Co. LLC v. Louisiana-Pac. Corp.*, No. C11-620 MJP, 2012 WL 2504873, at *6 (W.D. Wash. June 28, 2012) ("Under the [Washington Consumer Protection Act], a seller may be liable when it fails to disclose a material fact, even if the circumstances do not establish fraudulent concealment.").

Similarly, under the Maryland Consumer Protection Act ("MCPA"), a duty to disclose arises if a plaintiff does the following:

> must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1215 (S.D. Fla. 2022). Here, Plaintiffs' pled facts indicating that a duty to disclose arose from Defendant's exclusive knowledge regarding their NG scheme, active concealment of the NG Scheme, and

incomplete representations about beneficiaries' ability to receive generic drugs. These allegations are sufficient to state a claim under the MCPA.

Further, interpreting the Idaho Consumer Protection Act ("ICPA"), a U.S. District Court in Idaho granted a motion for summary judgment in favor of the defendant where the plaintiff put forward a "failure to disclose theory" because the court could not find "where the statute under such circumstances would require any such… duty to disclose." *Craigmont Air. Serv. v. Mills*, No 79-3070, 1982 U.S. Dist. LEXIS 10140, at *13 (D. Idaho Apr. 23, 1982). As Plaintiffs did not put forward argument claiming the contrary, and the Court could not find case law supporting a situation where a common law duty to disclose would arise, the Court must dismiss Plaintiffs' claim under the ICPA.

Next, invoking Federal Rule of Civil Procedure 8(a)(2), Defendants argue that Plaintiffs' consumer protection claims should be dismissed as an improper "shotgun pleading" because the Complaint does not plead the unique requirements of each states' law "by jamming claims together," thus failing to provide Defendants' adequate notice of the claims. (Def.'s Brief, p. 40-41). Rule 8(a) requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). There are four categories of complaints that could be considered impermissible shotgun pleadings:

(1) [A] complaint containing multiple counts where each count adopts the allegations of all preceding counts; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that does not separate into a different count each cause of action or claim for relief; and (4) a complaint that asserts multiple claims against multiple defendants

> without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*M.B. v. Schuylkill Cnty.*, 375 F. Supp. 3d 574, 586 (E.D. Pa. 2019). In essence, a shotgun pleading is one "that fail[s] to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* However, "[s]pecific facts are not necessary [for adequate notice]; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citations omitted).

Here, the pleading still provides Defendants adequate notice to satisfy Rule 8(a). As explained above, the Complaint makes detailed allegations about Defendants' actions to execute the NG Scheme over the course of approximately ninety pages. After incorporating these allegations, the Complaint lists the state consumer protection statutes that Plaintiff is invoking, then outlines in brief how these allegations are relevant to the statutes. As such, "Plaintiffs have drawn the connection between the statutes and defendant's offending conduct. This is sufficient for defendant and the Court to draw inferences that the elements exist." *In re Bayer Corp. Combination Aspirin Prod. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 378–79 (E.D.N.Y. 2010).

Finally, Defendants argue that Plaintiffs' claims under Georgia, Montana, Ohio, South Carolina, and Utah consumer protection statutes must be dismissed because those state laws do not permit class actions. (Def.'s Brief, p. 41). However, Federal Rule of Civil Procedure 23 "unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406 (2010) (plurality). In *Shady Grove*, the Supreme Court held that the

27

certification of a class-action under Rule 23 alleging violations of New York law did not violate the Rules Enabling Act, even though New York state law prohibited such a suit from proceeding as a class action. 559 U.S. at 406-09. The Third Circuit noted that "[u]nder the plurality's view [in *Shady Grove*], any supposed substantive purpose underlying [the statute] is irrelevant, and we need only determine whether Rule 23 'really regulates procedure,' which the Court has already concluded it does." *Knepper v. Rite Aid Corp.,* 675 F.3d 249, 265 (3d Cir. 2012). Therefore, because Rule 23 "really regulates procedure," and this Court has yet to make its determination on whether Rule 23's prerequisites are met, Defendant's attempt to dismiss these claims on these grounds is without basis.

In summary of the state consumer protection claims, Defendants' motion to dismiss is GRANTED in part with respect to Plaintiffs' consumer protection claim under the Idaho Consumer Protection Act, but the motion is otherwise DENIED.

## V.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in PART and DENIED in PART.

An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:

/s/ John Milton Younge
**Judge John Milton Younge**